1528 Riezler v. Allen. Before we begin, the court will enlighten, well let me allow counsel to get to their place before us. In light of the fact that the court has asked the parties to address an issue not briefed and we appreciate your having provided us with supplemental authority but for that reason I think it's sensible to give you extra time for your argument and so you can use as much as 30 minutes to a side if you need that much. You can, you don't have to race through the 15 minutes and you can spend a reasonable amount of time on the jurisdictional question as well as the merits. Thank you. Um, Ms. Drake. Thank you, your honors. Dr. Riezler pled in his complaint that Dr. Allen and Dr. Stabler's principal place of employment is a public state university. Let me see if I can understand what's going on here because I found the briefs a little bit confusing. If I understand the allegations, they are to the effect that Riezler gave information to Allen and perhaps Stabler while they were doing work in their university labs and that at that time the information may have been conveyed to them while they were acting within the scope of their employment but that later on in applying for the patent applications and in prosecuting the patent applications they misappropriated the information that Riezler had supplied and the actions in applying for and prosecuting the patent applications was not action within the scope of the employment and therefore that the Colorado statute doesn't apply to those actions. Do you understand that the same way that I do? I believe so, your honor. I believe that Dr. Riezler's position is that the operative acts for purposes of assessing scope of employment begin with the filing of the patent application and the commercialization of the inventions. So you agree that we have to find that he was acting within the scope of his employment at the time that he applied for and prosecuted the applications? We believe that this court can find that he was acting within the scope of his employment during that time period. We believe that in order to avoid the mandate of the court to find that at the time of the alleged inventorship and derivation, that time period, that Dr. Allen and Stabler were also acting outside of the scope of their employment. I don't understand the latter part. I do understand the former point that if they're acting within the scope of their employment and applying for and prosecuting the applications that the Colorado statute applies. I understand that argument. I don't understand why the Colorado statute would apply simply because they received the information in the scope of their employment if there's no allegation that that was wrongful. Because the duty to inform Dr. Riezler of the patents, any rights that Dr. Riezler has in the patent applications depend on his ability to show that he is in fact the true inventor. And that was the nature of one of the holdings in the University of Colorado v. American Cyanamid cases, which involved state claims. But I think, as I understand what he's saying, is I gave them the information. The receipt of the information was not wrongful. So that what happened in the scope of their employment was not wrongful. It was only later on when they were acting outside the scope of the employment that they committed wrongful acts. So under that theory, and I thought you agreed with me that that is their theory, I don't understand why the fact that they were acting within the scope of their employment when they received the information, or that they were acting within the scope of their employment when they invented the thing, brings them within the scope of the Colorado statute. None of those actions are alleged to be wrongful. None of which actions are alleged to be wrongful. It's not wrongful that they received the information. It's not wrongful that they did some alleged inventive activity. Those are not wrongful acts. What does it matter whether they were acting within the scope of their employment when they were receiving the information from Riesler if Riesler is not alleging that the receipt was wrongful? We believe Dr. Riesler is asserting that not just that the receipt was wrongful, but that Dr. Allen and Dr. Stabler then purported themselves to be the inventors of this and applied for patent applications. But that's the later activity. That's the later activity. But what I'm trying to, and I think you and I are on the same page about what the issue is with respect to the later activity, I'm not understanding why the earlier activity invokes the Colorado statute since there's no allegation that the earlier activity was wrongful. Well, the earlier activity would have to be wrongful in the sense that the necessary elements of a claim of theft of inventorship and unjust enrichment under state law require that Dr. Allen and Dr. Stable have derived the invention from Dr. Riesler in the first place. But the derivation doesn't have to be wrongful. Presumably it becomes, well, it is the conduct that is at issue. It's the nature of the entire claim, and it's correct that there's not one element standing alone that is wrongful. So if they have to produce any evidence about anything that Allen and Stable did while they were employed with the university, the claim is barred by the Colorado statute? No, we don't believe that our position is quite that extreme, Your Honor. I hope not. No. Our position is that actually, to take a step back, that throughout all of the relevant conduct, both the inventorship and derivation timeline of the conduct, as well as the continuing conduct after the invention was disclosed to the university and assigned to metabolite and commercialized, that throughout that entire time period, the professors were acting within the scope of their Colorado. Let me follow up, if I could, on Judge Dyke's line of inquiry, because I had the same question, and let me put my question this way. Suppose that instead of going to metabolite and setting aside all the relationships between metabolite and the professors and their continuing role as professors with the university, suppose that everything were the same with respect to the time and place of the acquisition of the information, but that in 1991, the professors both went off to a private company and then in their capacity as employees of that private company, they applied for the patent and did everything that happened thereafter. And Dr. Riesler sued them and the private company. Would they be able to invoke sovereign immunity? Arguably not, and we believe that that is not our situation. Arguably not. Because in that particular… Wouldn't it be surely not? Well, I would assume a certain additional facts then to supplement that. If I also assume that the professors did not disclose the invention to the university… No, they disclosed the information they got from Dr. Riesler. They may have even said, look what we've come up with. And then… All of that happened while they were employed by the university, but the application for the patent occurred two years later when they were private employees. They were… Employees of a private company. It severed their relationship with the university altogether. I understand. Okay. I did not understand the question. Okay, I'm sorry. So they've left their employment at the university. They've gone to start a private company. Right. They no longer have anything to do with the university. Then in those circumstances, then the only way that the CGIA would apply is if our argument were that you can look solely at the inventorship conduct and not at the later commercial activity. So in… Is there any Colorado case that in Judge Bryson's hypothetical suggests that the statute applies? I couldn't find one. If you know of one, I'd like to know about it. Well, we believe that there are a number of Colorado cases that just stand for the proposition that when you're suing a state employee, there's a district of Colorado case called King that involved a campfire that was started by some students of a charter school, for example. But what's the answer to my question? Is there any case that suggests that in Judge Bryson's hypothetical the Colorado statute would apply? Oh, for that particular hypothetical. I don't believe that there's a case that has that particular fact pattern. Or anything like it. No, there really are no Colorado cases that arise in the context of inventorship disputes involving professors or university. Or wrongful acts taken after somebody ceases to be an employee. Not that we found. Not that have that chronology. Okay, so let's focus then on what happened when they applied for the applications. Okay. As I understand it, the contention is that when they applied for the first application, the 126 patent, in December of 1992, that they were acting on behalf of the university, correct? Yes. Okay. But what about after the March 1993 assignment to metabolite? Okay. Yeah. So, what is the basis for suggesting that any actions that they took after March of 1993 in prosecuting the application that led to the 126 patent, and applying for and prosecuting the other four applications, was action taken within the scope of their employment? The University of Colorado patent policy, which specifically requires that faculty, even after the university has made a determination that the invention would be assigned to one of its designees, that faculty have a continuing obligation under the patent policy and pursuant to their employment contracts to participate in the prosecution and sign any documents. That's a vague thing. Is there any testimony by anybody in this record that after March 1993, Allen and Stabler were acting within the scope of their employment in continuing to prosecute the 126 application and applying for and prosecuting the other application? I'm not sure if there's any testimony to that effect, because we would believe that that would be the ultimate conclusion of the law, that they were acting within the scope of their employment. It's a mixed question of law and fact. Was there any testimony that they were acting within the scope of their employment after March 1993? Well, I believe that Dr. Allen may have testified to that in his deposition. May have? I couldn't find it. Can you show me where he testified to that? No, I cannot, Your Honor. I don't know that he did. I don't know that that question directly was presented to him by the plaintiffs when they took his deposition. Okay, but suppose that at least beginning in March 1993, he was acting for himself or acting for a metabolite. How can that action be protected by the Colorado statute, post-1993 action? If post-1993, he were acting purely for his own benefit and metabolites benefit and there were no relationship with the university and he was not continuing to prosecute the patents and affect the commercial transactions pursuant to the university policy, then he would be acting on his own. But in this court's decision in the Cho case, there was a circumstance where a university professor admittedly at a private university, the University of Chicago, was accused of theft of invention. And the university policy in that case was similar to the one here where it permitted the university to either take ownership or direct assignment of faculty inventions to a designee. Yeah, but I don't think that helps you. I mean, we've got to deal with what the record is here. And the record, as I understand it, is that there isn't any evidence that they were acting within the scope of their university employment after March of 1993. Well, in the Cho case, what the court specifically said is, whatever the arrangements concerning the assignment and ownership of the patents, those decisions belong to the university and the professor was acting as the university's agent when he arranged the business transactions. So we would say that that's what it was. But maybe they were there, but the question is, what were they doing here? And there's a complete lack of evidence that they were acting for the university after March 1993. Well, the university, after March 1993, continued to hold an interest in the patents. Let me ask you this question with respect to the university's interest. Suppose that instead of the complex arrangement that we have here, you had a very simple arrangement. The doctors went to the university and said, you know what, we do work here full time, but we've been doing a little moonlighting and we've done it at the lab, but I hope you don't mind. And we really have in mind doing some inventorship patent work, getting a patent, ultimately, is that OK? And the university says, well, it's fine, but we'd like 25% of whatever benefit comes from this patent. But it's your patent. You put your name on it and so forth. Is that enough to constitute them as acting as agents of the state for purposes of immunity? I would say no, because then now it's going outside of the university policy. No, the university's policy is, we'll let you do this, but we want a quarter share of whatever your benefit is. It's a 25% share. OK. That's the university's policy. People can get the patents. They can do whatever they want, but in exchange for the right to use the facilities and because you're employed here, we'd like a little bit of a piece of the action. And would the invention in that case be related to the professor's hematology practice or would it be something entirely separate? Let's assume. Take them in order. Yes and no. In either event, does the university's policy render them state actors with respect to their patent procurement? Assuming, for starters, maybe the easier question for my purposes is, assuming that the inventorship is within the field of their hematology practice and the professors have asked, can we set up, we'll do the work within the university laboratories, but we'd like to have the patent assigned and give the university a share. It's difficult for me to understand. The university policy gives the university great discretion in how it wants to treat faculty discoveries. The hypothetical is the university gives them the patent. You have it, but when you exploit it, you have to share the revenue with us. You have to give us 25%. Does that mean that they're acting within the scope of their university employment in exploiting the patent? Yes. Why? Because there's no other reason that the professors would need to share 25% of the revenue with the university. All right, let's change the facts a little. You set up a corporation and the university says, we want to be one-quarter shareholders in the corporation. Does their one-quarter shareholder role make the actors state actors? The corporation is owned, a quarter of the shares in the corporation are owned by the university. Does that make the employees and officers of the corporation state officers? I think that that would be evaluated under the arm of the state authority. I don't actually know whether the private company... The California Pension Fund is a state entity. It owns shares of an awful lot of corporations, considerable shares, I would guess, of, say, Ford Motor Company. That doesn't make Ford Motor Company a state actor. Right. Right, so what's the difference here in my hypothetical? I'm setting up a hypothetical that is exactly the same as CalPERS owning a chunk of Metabolite. Yeah. Well, what's different... state actors, correct? That alone would not make them state actors. I mean, they are state, but these professors are already university employees. But some of their actions are as university employees and some of their actions are on behalf of Metabolite, on behalf of themselves, right? I mean, their whole lives are not devoted to acting as university employees, correct? Well, that's true. But the conduct that's at issue here is not that they mismanaged the finances of Metabolite or that there was some other conduct reaching a fiduciary duty to Metabolite that is separate and apart from their role as professors. The argument is that they were acting for themselves or acting for Metabolite in applying for and prosecuting these patents. And isn't there at least a fact issue as to whether that's true or not? No. Well, we believe that that's an inference to be drawn from the underlying facts. And we would assert that the material facts in that analysis are that the university considered its own interest in these patents and determined that it was in the university's best financial interest for these patents to be assigned to an entrepreneurial new venture. And that even after the assignment that the professors would be continuing to act for the university rather than for Metabolite? Well, with respect to – at that point, there's potentially a separate question of whether Metabolite has liability for the acts of the professors after that point. But we believe that the operative inquiry is separate and apart from whether Metabolite has liability, whether the professors were acting within the scope of their employment. And because the policy does say that the professors need to, pursuant to their university employment, continue to participate in the commercialization – But isn't there at least a fact issue as to that? Don't you have to concede that there's at least a fact issue as to whether they were acting for Metabolite or acting for the university? Well, there is an issue of fact to be determined, but it's our position that that can be determined from the facts of record here. We don't make fact findings. The district courts make fact findings. That's right, but if the facts are – In fact, you complain in your brief that the district court didn't make fact findings. Our position is that we don't actually know whether the district court was applying a summary judgment standard here or a 12B1 standard, but it was proper for this to be considered under a 12B1 challenge to the court's subject matter jurisdiction. And if the court found that there were genuine factual disputes, then it should have made the factual findings in order to resolve those disputes on 12B1. We can't make those findings, right? You cannot make those findings, but our submission is that on the undisputed facts in this record, there are disagreements about which facts are relevant. So isn't it possible that what the district court was saying, I'm denying summary judgment, I think there are fact issues here which are going to have to be resolved in the course of the proceeding, and I'm not ready to do that yet. It's possible because the court didn't outline its reasoning. And that would be permissible, right? Well, we would say that it wouldn't be permissible on a 12B1 motion where the – Well, he converted it to a summary judgment motion. He did, but it was proper to convert it to a process where the court could look beyond the pleadings and take discovery and consider the facts, but on a challenge to the court's subject matter jurisdiction, which is what the CJA notice provision is, it's a jurisdictional prerequisite to the suit, the court was required to treat it as a 12B1 motion and be the fact finder, to make the findings a fact if there were disputed facts, to essentially satisfy itself that there is jurisdiction for the case to proceed. But he didn't. Right, exactly, he didn't. So how can we rule for you now? Well, our belief would be that the court can look at the facts that are in this record and determine what the relevant facts are, which in our view, the relevant facts relate to what the university policy provides and the university's stating its own interest in the patent, the professors being employed and required by their employment to do scientific and creative work, that looking at the facts that we would assert are the material facts, that on those facts the court can decide as a matter of law, as it does in, as courts of appeals do in other immunity contexts where there is an established record to apply the facts to the law. Why shouldn't this just be decided as part of the trial? Because we don't believe... Isn't there a close relationship between scope of employment and we've got to figure out what the wrongful acts are and who did what? I mean, isn't there a relationship between the scope of employment issue and the merits? Well, we don't believe that they're intertwined because we... The fact is that there's no dispute that the invention was fully described and disclosed by February 1992 on university letterhead and that the, so the inventorship, both parties have conceded that by February 1992 the invention was fully described. And so before February 1992, when the derivation allegedly occurred, where all the communications that would support derivation occurred, where either side's alleged conception occurred, all of these things on which the theft of inventorship claims hinge, all of those events occurred before Metabolite ever had any interest at all in any of these inventions. No, no, that's not true. They're alleging that there was wrongful action after March 1993. That's right. I said before February 1992. In that time period before February 1992, there was no interest by Metabolite in any of these inventions. Well, I'm not sure they're saying any wrongful acts occurred then. Well, they're saying that Dr. Allen and Dr. Stabler derived the inventions from Dr. Allen. They're not saying that's wrong? Well, if it's not wrongful, those are the claims on which the state torts hinge. That's what the court said in American Cyanamid, that unless there's a proof that Dr. Riesler is, in fact, the true and sole inventor, which requires proof of conception and derivation, there are no claims for failure to disclose or fraudulent concealment because there's no duty to disclose any of these patents to Dr. Riesler if he's not, in fact, the true and sole inventor. So the conduct at issue, the conduct for which these professors are being sued, is theft of invention. And the theft of invention must have occurred before February 1992. Why? I don't understand that. Because by February 1992... They had a cooperative arrangement. Nobody's saying that they stole in the dead of night and broke into the offices and got the information. Everybody agrees that it was given to them voluntarily, and so they rightfully received it. There's no wrongful act alleged in receiving the information. Well, there's arguably a wrongful act, then, in Dr. Allen disclosing the invention to American Cyanamid, which was a third-party licensee, on his own behalf. That happened in February 1992, and they say that at that point, Dr. Allen was sharing the invention as his own, on university letterhead, we would add, to this third party, the letterly division of American Cyanamid, as his own invention. And Dr. Riesler does assert that that was wrongful, that that was taking his invention and trying to license it, separate from any interest that Dr. Riesler claims he had in it. Ms. Drake, so I understand... Ms. Drake, your position is that there's no dispute as to any historical facts. And by that, I mean what happened on a given day, who said what, who didn't. Correct. Correct. Apart from inventorship, which we believe does not need to be decided here. Right, no, I understand. That's not relevant to the case. But what you're saying is that each side points to different facts that aren't in dispute as being pertinent as a matter of law. Correct. You point to facts X, the other side points to facts Y. You say under the correct law, we have to look to X. They say under the correct law, we have to look to Y, right? That's exactly correct, Your Honor. And we believe that this court can make that determination as a matter of law. It can look at the record and say, these facts are relevant, these facts are not. What facts, in your view, or what doctrine, and it may be embodied in a case, tells us who's right on what facts we should look to? If you're asking whether there's a presumption or a burden here? No, no, what I'm saying is, you tell us these facts are pertinent. The other side says these facts are pertinent. What case or doctrine will tell us, should we look to for guidance as to who's right on what facts are pertinent? Well, we would submit that the American cyanamide case tells, which is the University of Colorado American cyanamide case, tells the court that claims for theft of invention and unjust enrichment are, that they hinge on proof of inventorship. That that is the whole predicate for the state claim. And so our position is that is the relevant conduct, is the derivation and the theft of inventorship, all of which would have had to happen before Metabolite had any interest in it. We would also, though, submit that the Cho case speaks to the point that a professor acting pursuant to university policy, even in assigning an invention out to a private company in which he retains an ownership interest, that as the court said, that whatever those arrangements are, those decisions belong to the university and the professor was acting as the university's agent when he arranged the business transactions. So those are the primary cases we would rely on, that the professor can act as an agent of the university, even if the professor is at the university's determination pursuant to university policy, assigning the invention to another company in which he even has a financial interest. That's all pursuant to the policy and that those facts are relevant to determine that not only the inventorship, but also the subsequent business transactions that resulted in commercialization were all pursuant to university policy, which professors were required to follow pursuant to the University of Colorado employment. Why don't we save the rest of your rebuttal time, Mr. Aiken. Thank you. Thank you, Your Honors. May it please the court. We submit that if this court focuses on the injury that is actually at issue in the state law claims, that inquiry will resolve both the jurisdictional questions you've asked, as well as the merits of the immunity claim. To what extent, if any, are you arguing that wrongful conduct by Allen State took place before the December 1992 application that led to the 126 patent? I'm not sure that we are. I mean, there could be some individual acts that could come out in future discovery in terms of the case, but the wrongful conduct that we're alleging for the state law claim is the failure to disclose the filing and prosecution of the patent application. So that's the conduct. I mean, I'm not aware of any wrongful conduct prior to that. I mean, Dr. Allen may have had something in his head about doing something, but we're not alleging that. That's not the actual. You're saying if they had, if Dr. Allen had gone ahead and filed this patent application and one week later had notified your client, said, Dr. Reiser, here's what I've done. Please be advised, et cetera. You're saying there would be no, no claim here. One week after the application was filed. Yes, I think that's correct because it would be the failure to disclose. The claim is the failure to disclose the filing and prosecution. What you say was the physical act here or conduct that you say forms the basis for your claim is the filing of the application followed by nondisclosure of that filing to Dr. Reiser. That's correct. And it's your theory that beginning in December 1992 with the filing of the application that they were no longer acting within the scope of their university employment, but were acting for themselves and for metabolite. We actually believe that they were not acting within the scope of their university employment from December and actually from earlier with respect to deciding to do that. But I don't think that's necessary for even to, for this court to get that far and address it because what's only, what's necessary really is only to take the, is to take the December 1992 on forward or in this case the March 1993 time period on forward. Which is it? Either because March 1993 is good enough because the time period in question is from the filing December 1992 to the end of let's say the last patent which is 2003. So if you start with March, frankly I think there's, we should be able to meet our claim. I mean our, the claim is good enough if you start with March of 1993. Does that make sense? What significance, if any, there's material in the record with respect to these discussions that took place in July of 1992 and there's a memorandum in there I guess reflecting what happened to the July 13, 1992 memorandum in the record. Of what significance is that in terms of the immunity issue that we're dealing with today? It is, it's significant only in so far as, there is admittedly some dispute in briefs about what was actually happening at that meeting and whether there was a disclosure or not a disclosure. I think the only thing that you can get out of that meeting is that the parties decided at that time that this patent application would be filed on behalf of Metabolite. The parties being Dr. Allen and the university officials? Dr. Allen, Mr. Lefkoff who was a University of Colorado Foundation official and the other person who was a university official. Mr. Mature? Yes, so I think that the significance is that if this court were to look, were to decide it needed to look earlier than the December 1992 time period, there's the evidence. We haven't focused on that frankly in our argument because we don't even think you need to, you just need to start with the filing and the prosecution. I guess what you would say is it's your position that that memo reflects the university via the foundation giving Dr. Allen a green light with respect to this endeavor, is that correct? They're saying this is your baby, you can go ahead now. That's how Dr. Allen, that's how we believe Dr. Allen described it in his deposition testimony with respect to that and yes, that's what we think is reasonable. Go ahead, please. I'm sorry, okay. We don't, we're not saying that that was necessarily all, that that meeting occurred pursuant to a disclosure under the policy. We're not conceding that, I just wanted to make that clear. Are you, it sounds as if you're saying, at least in part, that we don't need to prove anything before December 92 or March 93 in order to make out the tort. But presumably you will try to prove something with respect to some conduct preceding December 1992 that you will allege, I would assume, is part and parcel of this entire sequence of unlawful activity. So I'm wondering whether the statement that it isn't necessary to prove anything before 1993 really answers the question of whether there shouldn't be, whether we shouldn't consider the pre-March 1993 conduct with respect to the question of immunity, if in fact at trial you intend to predicate your case in part on pre-1993 activity. Well, there's no question that to prove the merits of the claim that we first have to prove that Dr. Riesler was the inventor. But that's different, I'm talking about the statement of the claim. But that's different than the sphere in which the conduct, the specific conduct for the claim occurred. I mean, so in other words, if you consider the filing and prosecution of an invention, of a patent related to an invention as the commercialization of the invention, we're saying that, well, yeah, in order to have a right to commercialize it, we do have to prove that we invented it. But that's a different baby than saying the commercialization occurred in this sphere. But you'd also have to prove, wouldn't you, that Riesler gave the information to Allen and Stabler at some earlier point? Yes. And suppose, and their contention appears to be in part, that they were acting within the scope of their university employment when they received that information. I don't... Are you suggesting that the receipt of the information was wrongful or not? I'm not suggesting that the receipt was wrongful. I'm not... The receipt of the information is not part... What we're suggesting is the receipt of the information is not part of the wrongful act in filing with the fraudulent disclosure. The receipt was when Dr. Allen was working as a consultant under the, what was, when Metabolite was doing the work for Dr. Riesler's endeavors, correct? Yeah, and that's another thing that I wanted to make clear, at least with respect to some of the question you had about the scope in which some of that original activity occurred. Again, in our brief, we have focused on and basically tried to make it simple and focused it only on the subsequent time period. But the district court did find in the hearing that that initial interaction between Dr. Riesler and Dr. Allen occurred outside the scope of Dr. Allen's employment. And by doing so, I believe he did. And the reference to that in the discussion relates to the contract that OPS had with Dr. Breach's employer, OPS, had with Dr. Allen. The contract and Judge Mache had raised that issue in deciding that. I don't think, again, that it's necessary to reach that point. Aren't these scope of employment issues really intertwined with the merits? I mean, why are we trying to decide these issues based on this sparse record at this time when the whole theory of liability and what acts are wrongful and what acts are not wrongful remains to be determined? I don't think that, I think that what the acts that are wrongful that need to be determined, the specific allegations are clear. Well, they're clear, but they seem to be suggesting that even after March of 1993, that somehow or other, Allen and Stabler were still acting within the scope of their university employment. Right? And why should we try to decide these issues of scope of employment and the consequent coverage of the Colorado statute until we know what the facts are? There's been a trial, and there have actually been findings as to who did what to whom and when. Because I don't think you need to decide. I think the trial judge already did. I think the trial judge recognized that all of that stuff was not relevant. The trial judge. All of what stuff? About some aspects of the policy or what interest the university had in metabolite or didn't have in metabolite. I think the trial judge recognized that metabolite was privately owned. You're saying there's no genuine issue of material fact that would necessitate a trial as to what happened after March 1993. You're saying that it's clear from the record that they were not acting within the scope of the employment after that point. That is correct, sir. The facts are. Okay, but what about between December 1992 and March? We have an affidavit and testimony from Allen that seems to suggest that he was acting within the scope of his employment in making the initial application. So, isn't there at least a fact issue as to whether Allen and Staber were acting within the scope of their employment between December 1992 and March of 1993? I don't think there is because the testimony was in effect that he believed he was doing it under university policy. I think that you can find as a matter of law, looking at the policy and knowing that there was no assignment to the university, that the university had no ownership interest in the patent at the time that it was filed in December of 1992. There aren't a lot of facts, but the facts that are in the record are sufficient to find as a matter of law. You say the university had no interest in the patent. Now, I guess it's undisputed that the university ultimately had a financial stake in the proceeds of the commercialization of the patent, correct? Yeah, if I could clarify that. The interest was not unique to these patents. The interest that the university had was simply that as a function of having assisted in forming Metabolite as an entrepreneurial new venture in 1988 and providing the services of Colorado venture management through the foundation, the university took an approximate 15.5% take of the net profits. Upfront and in general, and therefore, they did have a stake in this patent. They may not have been assignees, but they had a stake in the proceeds, right? Indirectly, yes. I mean, because the patents benefit Metabolite and the university benefits when Metabolite benefits, yes. But I don't think that that, by any stretch of the means, by any stretch of the imagination, establishes any sort of university control over the filing and prosecution of the patents. Judge Matches didn't exactly fill the joint appendix with his findings and conclusions of law here. What do you take it that Judge Match said or held with respect to the question of whether these defendants were acting in the scope of their employment or purposes? Do you understand him to have said, on the one hand, that to have simply resolved that question conclusively by himself, or to have said that I think that summary judgment type disposition is appropriate here? I take him to have resolved the issue conclusively. He actually made findings of fact as opposed to saying that there isn't enough here to take to a jury? To have recognized that the relevant findings of fact were undisputed and he could decide as a matter of law. So you think, again to go back to Ms. Drake's point of distinguishing between summary judgment and 12B1, that he actually ruled as a matter of 12B1 that there's rejecting the jurisdictional argument as opposed to doing this as a Rule 56 type disposition? I suppose so. The distinction, when it's a pure legal question, it doesn't matter when it's a pure legal question. That's the issue. But it isn't a pure legal question, really. It's a question of scope of employment is applying the law to the facts. And it's hard to tell what he was doing. I mean, isn't it possible that he was just saying, well, I think there are genuine issues as to this thing. I don't see right now that there's been any proof that the Colorado statute applies. How do we know that he wasn't open to reconsidering that as the case progressed? In other words, did he really reach a final decision on this issue? I acknowledge that the hearing transcript doesn't definitively say that. And I think the only other way that we know that is by looking at the scheduling conferences and the proceedings leading up to that time period. And Judge Mage did say at one of the earlier conferences that the substantive law of Colorado is, I've got to deal with this first. And the substantive law of Colorado is that you decide this conclusively as a threshold issue prior to going forward. That's not necessarily binding on him, though, is it? The procedure that he uses? It's a good question, and we tried to figure that out. I think arguably it is binding on him, but it's not clear. And the only decision we've been able to find with respect to that is there's the Aspen orthopedics decision that is referenced in one of the briefs. There's a concurring opinion in that decision in which the concurring judge says that the Colorado right not to stand trial is a substantive right. And so we're bound to follow that and respect it. And I think what you can get out of that is that it doesn't explicitly say that, but it's kind of like an eerie analysis saying that when you consider the cusp of whether this is a substantive or procedural issue, that judge at least was saying it's more of a substantive issue and I had to follow it. Now, we did say in our brief it's not at all clear whether the judge was required to follow that. We think the operative point for your jurisdiction or for your consideration is that he did. He says that if you look at the transcript, I mean, it is looking at page 30 of the joint appendix. He said, you say at the bottom of A30, Your Honor, where we are is that you indicate you want to resolve these issues first and then would hold. Then he says at the top of 31, the court done a conference and schedule, you're speaking, so we haven't done anything else other than brief this issue. Then he says, all right, so give me a calendar. We'll get another scheduling conference on the rest of the case and get on with this. Are you saying that we should read that colloquy as suggesting that the judge, in his view, had made a definitive ruling on the immunity issue and now, okay, we're going to get to the merits? Yes, that in conjunction with some of the material that was submitted with respect to his discussions at the scheduling conference, that that was what he indicated. The material you submitted with your letter? Yes, some of the material we referenced in the letter was actually in the jury. Where is that in the appendix exactly, that material? It is A216 is the page that your submission contained an excerpt from. Yeah, I think the strongest, our letter has it at, cites 188, 195, 216, and 217, and I think probably the strongest evidence is 195 and 217. 217? 217 was submitted with the letter. Well, and maybe 195. I think it's 195 where he says that this is a substantive issue in Colorado law and I've got to deal with this. And 195 is in the main appendix. Is it page 217? I don't have it at 217. 217 was some of the pages submitted with the letter. Submitted with the letter. Oh, oh, I see. Okay, oh, I, yeah, yeah. Do you have the letter? Yes. And it's on line 21, beginning on line 21. Wouldn't we be better off if we found out what he thought he was doing? I think, I think that what he was doing was finding it conclusively, he knew what he was doing. And, and, because I think this court can assume that he knew the law, Colorado law, when he said that he's going to, that this is a substantive issue. And this clearly was what the parties had asked for and wanted. So, I guess that's the best I can say with respect to that. So the, the clearest statement, you think, of his intention to rule as opposed, there are three possibilities, actually, I guess, as Judge Dyke's question earlier indicated, that he could have denied summary judgment, he could have granted summary judgment, or he could have granted, 12B1, in which would entail the possibility of making findings of fact, which you can do in a, in a jurisdictional setting, which you can't do in the summary judgment. We're left somewhat at sea about knowing whether he's, which of those three he's, he's done. And you say the best evidence for us to look at to determine that he's done the third of those is page 217. Well, I'm sorry, it's, it's, it's 195. 195. And it's in the main appendix. And, and the particular. Line 18 starts there. All right. I agree that the procedure that's directed by the Colorado Courts does not trump the federal rules of civil procedure. On the other hand, it is, in a sense, substantive law of Colorado with respect to at what point is the immunity raised and applicable, sort of like qualified immunity in the Civil Rights 1983 cases. Of course, if you read those cases, they'd suggest maybe you can postpone the decision if there are fact issues. That, that's correct. I'm not getting very much out of that, frankly. Okay. What is, what are you getting out of it and I'm not? What I'm getting out of it, based on that in conjunction with the whole. Right. The number of conferences and what happened is that he was going to decide this issue and be done with it. And that's what the law of Colorado is too, that you decide that issue and be done with it. And if, if, if, if the defendants were immune, they were immune and we were out of there. And if the defendants weren't immune, they were not immune and we were going to move forward. And that's what they said at the hearing. Of course, he'd be done with it if he'd granted summary judgment on that issue as opposed to 12B1. But you say that may not be much difference between those two. Right. Maybe important fact that you can make findings of fact in the former and not in the latter. Right. But, but I would, but neither, right, that's correct. But I think that both parties expected this to be done on that because nobody, neither party actually asked for an evidentiary hearing because I think both parties believe that the issue could be definitively determined by the facts that were in the record. Mm-hmm. So, you have nothing further? I have nothing further. Ms. Drake, you have some rebuttal time if you need it. We don't, we don't know what the district court had in mind when Judge Mage denied the motion. He should have treated it as a 12B1 and made findings of fact to support the district court's jurisdiction. If he was deciding it as a summary judgment motion and deferring the issue on genuine issues of fact, he didn't say that. Well, but there's a third possibility, which is he decided it on summary judgment against you. That is right. That there's a possibility that he decided it against us, in which case we, our position here is that he decided it wrong as a matter of law on the facts of record. For the court to consider only the facts that follow the filing of the patent application would be essentially to ignore the American cyanamide directive that there is no duty to disclose any patent application or patent to an allegedly unnamed inventor unless that inventor first proves that he is, in fact, the true inventor. And Dr. Allen, while there is no deposition testimony where he said that conduct following the assignment of metabolite was on behalf of the university, he did say in his declaration at A1174, my filing of the patent application in December 1992, that was the basis for all the patents at issue, was on behalf of the University of Colorado. So in order for the court to affirm the district court's determination here, it would have to essentially ignore all of the actual inventorship conduct, the nature of Dr. Allen and Dr. Stabler's employment during the entire period of inventorship, and at the time they filed the patent application, and look only to conduct that came up later. And we would submit that that would not be the correct application of law in this case. Just so I'm sure I understand, to picking up on your response to the colloquy that the court had with Mr. Pardon a minute ago, is it your view that the judge in the district court, in his mind, was making a definitive ruling on the immunity issue? I believe so. I believe that there is indication in the record that he was and that he was supposed to because it was a jurisdictional challenge. But I don't know, because he called it a summary judgment motion and denied it as a summary judgment motion, I would really be speculating. And he didn't make findings a fact, so that if he was ruling against us as a matter of law, then he should have made findings a fact to support that determination. If he was deferring the matter as involving genuine issues, then we would submit that that wasn't the proper procedure on a 12B1 challenge to his jurisdiction. Suppose that there had never been a patent application in this case. Everything had happened just as it is alleged to have happened. Take both sides' allegations. Or, more properly, take the allegations in the complaint. Everything had happened just as alleged up until December of 92, and then all activity with respect to these events stopped. Would there be any actionable tort? I suppose that the plaintiffs would still claim that they were omitted from the filing of the patent application. No, no, there was no application. So nothing before December 1992 was actionable? Standing alone. I understand. But similarly, nothing after that point was actionable on its own either. Mm-hmm. Okay. They all run together. You can't have one without the other. It's a continuous set of elements. And according to American Cyanamid, it all has to start with proof of inventorship. Because without proof of inventorship, there's no duty to disclose the applications. There's no duty to name him on the patent applications. All of the subsequent tort conduct, it simply doesn't exist as a duty unless there's been inventorship. So again, our submission would be that to look at the relevant operative facts of scope of employment would have to include a consideration of the inventorship time period, the disclosures to the university, and the filing of the patent application. And all of that conduct predates the assignment to Metabolite. And because it was on behalf of the university, we believe it was in the scope of his employment. Thank you. I thank both counsel. The case is submitted. The honor report is adjourned from day to day.